UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                       :

  UNITED STATES OF AMERICA               :
                                                        :
                    -v-                        :                    15-CR-106 (JPO)
                                                       :

  GREGORY JACKSON,                   :             OPINION AND ORDER
                                 Defendant.  :
                                                        :

-----------------------------------------------------------X

J. PAUL OETKEN, District Judge:

      Defendant Gregory Jackson moves to suppress two handguns found on his person and statements that he made to officers of the New York Police Department ("NYPD").  On June 26, 2015, this Court held an evidentiary hearing, at which NYPD officers Moises Contreras, Adam Malki, and Steven Ramunno, and defense investigator Glenn Almas[1] testified.  (Dkt. No. 17, Transcript ("Trans.").)  For the reasons that follow, Jackson's motion is granted.

## I.      Summary of the Testimony

      Shortly after 10:00 pm on February 8, 2015, Jackson walked into Joyce Kilmer Park in the Bronx.  There, he encountered Contreras, Malki, and Ramunno, seated in a marked police van.  Because the park was officially closed, the officers stopped Jackson to investigate.  Shortly after stopping him, the officers frisked Jackson, and, upon discovering two handguns in Jackson's jacket, arrested him.

### A.      Contreras

      Contreras has been an NYPD officer for two and a half years.  (Trans., at 4.)  He is currently assigned to "Operation Impact," where he is "designated a couple of blocks' radius,

---

[1] Because the Court ultimately concludes that the officers lacked reasonable suspicion to frisk Jackson, the Court need not, and does not, consider Almas's testimony.

[and] basically just listen[s] to radio runs, address[es] quality-of-life conditions that may arise . . . [such as] [p]eople loitering, gathered in the corners, drinking beer in public perhaps, trespassing in the park" and the like. (*Id.* at 5.)

He often patrols Joyce Kilmer Park after closing. (*Id.* at 6.) If he sees someone in the park after closing, he "will approach and let them know that the park has been closed" and ask that they "please make their way out of the park." (*Id.*) He approaches everyone he sees in the park. (*Id.*) But he does not always issue summonses. Instead he "like[s] to see if [he] can determine a reason offhand why someone would be in the park." (*Id.*) "So, for example," he testified, "if I see an elderly lady walking her dog in the park, that might be a reason. A couple sitting on the bench, that might be another reason." (*Id.*) Contreras testified that Joyce Kilmer Park "can be a high-crime area," where "there's been . . . shots fired," where "[n]arcotics takes place," and where "[p]eople [have been] robbed." (*Id.* at 7.) At the entrance to the park, there is a sign indicating that the park closes at 10:00 PM and that anyone in the park after 10:00 PM is trespassing. (*Id.* at 12; Government's Exhibit 4.)

On February 8, 2015, Contreras was patrolling the park with Malki, his partner, and Ramunno, his training officer. (*Id.* at 8.) The three were seated in the front of a police van. (*Id.*) Ramunno was driving, Contreras was in the front passenger seat, and Malki was in the rear middle seat, which, given the configuration of the van, put him "basically in the front seat." (*Id.* at 37–38 (question from defense counsel answered "Yes.").)

Jackson entered the park near 164th Street and the Grand Concourse. (*Id.* at 11.) When Contreras saw this, he "carefully observed [Jackson's] behavior upon entering, and . . . saw him proceed down the walkway." (*Id.* at 17.) He was walking toward the van. (*Id.*) The officers started "slowly driving up toward" a fork in the park's pathway, in Jackson's direction. (*Id.*) "[T]hat's when he started walking . . . away from" the van. (*Id.* at 17.) Contreras and Malki got

2

out of the van and "called over for [Jackson's] attention." (*Id.* at 18.)  They exited on the

passenger side of the van and walked around the front of the van to reach Jackson.  (*Id.* at 62.)

They had to walk at a "moderate pace" to catch up to him.  (*Id.* at 61.)  "Sir," Contreras said, "are

you aware that the park is closed right now?" (*Id.* at 18.)  Jackson responded that "he was just

cutting through." (*Id.*)  Contreras thought this "was a very quick response." (*Id.*)  "[I]n my

opinion," Contreras testified, Jackson "seemed to be walking away from us and not really—his

body was turned away from us, it wasn't really facing us and giving us, I guess, our attention in

regard to the questions I was asking in terms of his reason for being there." (*Id.*)  Jackson

"seemed somewhat erratic, a little vibe of nervousness in terms of wanting to just give a quick

answer and continue on his way down the path instead of addressing us." (*Id.* at 19.)

Contreras and Malki wanted to get Jackson's attention, (*id.*), so Contreras "calmly . . . put

[his] hand on [Jackson's] shoulder[2] . . . ." (*Id.* at 20.)  Contreras testified further:

> At that point, we asked if he had any identification, and I could see he
> seemed—upon being close to him, he seemed very nervous, his eyes were kind of
> darting away, not wanting really to face us, at which point I was in fear for my
> safety and my partner's safety, so I asked him if he had any weapons on him.  His
> answer to that question was nonverbal, and he proceeded to lift up the shirt that he
> had, he lifted up his shirt, and kind of had his arms like this,[3] exposing his
> waistband, which I saw as a means of kind of deflecting our mindset towards him
> possibly having weapons, I would say towards lowering our guard in terms of
> here's my waistband, I'm being compliant with that.  His arms were locked in.
> Naturally that whole behavior of doing that was very odd to see because
> I've never—I mean, I've asked that question before to several people, they don't
> usually say nothing nonverbal and just do that motion.
> So at that point, I felt that he may have indeed a weapon on him, and I
> proceeded to do a frisk of the left side of his jacket to ensure he didn't have a
> weapon, and that's when he, in fact, did have a weapon.

---

[2] Later in his testimony, Contreras said that he "grabbed the side of [Jackson's] hand," rather
than his shoulder.  (*Id.* at 65.)

[3] At the hearing, Contreras pantomimed lifting his shirt from the waist while keeping his elbows
relatively close to his body, but not locked to his sides.  To do this, Contreras bent his wrists
downward as he lifted his hands upward.

(*Id.* at 19–20.)  As Contreras frisked Jackson's left side, Malki frisked his right.  (*Id.* at 23.)  The guns ultimately turned out to be in the two "interior pockets [Jackson] had in his jacket."  (*Id.* at 24.)

At another point in the hearing—in response to the question "Did you notice anything about his jacket when [Jackson] lifted up his shirt?"—Contreras testified that "the jacket seemed weighted down somewhat, it wasn't kind of fluid.  There was a slight bulge on my side as well [as] the left side."  (*Id.* at 22.)  "The leather jacket was open" (*id.* at 66.), and Contreras thought that Jackson was using his elbows to "not move his jacket, just keep it very close to his body." (*Id.* at 22.)  This was the "first time [Contreras] actually felt a gun on someone." (*Id.* at 23.)

### B.    Malki

Malki has been an NYPD officer for two years.  (*Id.* at 83.)  He too is assigned to Operation Impact, and his duties are similar to those of Contreras.  (*Id.*)

According to Malki, Jackson entered the park on 164th street and Grand Concourse avenue, and the officers "pulled the van towards him."  (*Id.* at 86.)  When the van began to move, the officers "kind of met [Jackson] at the crossroads, so he kind of hesitated and tried to go right when we approached him."  (*Id.* at 87.)  Jackson took a "stutter step" and exhibited "you know . . . I don't know, nervousness."  (*Id.*)  Jackson saw the officers and then "tried to go [to his right] . . . so [the officers] wouldn't speak to him."  (*Id.*)  He did not get very far.  (*Id.*)  "His eyes were darting from side to side.  He was—his adrenaline was up."  (*Id.*)

The officers called Jackson over and got out of the van.  (*Id.*)  Contreras went around the front of the van and Malki went around the back.  (*Id.* at 88.)  They asked Jackson if he knew that the park was closed.  (*Id.*)  He "wasn't really giving" the officers "a complete full answer." (*Id.*)  The officers asked him if he had identification.  (*Id.*)  "He said yes."  (*Id.*)  They then "asked him if had anything on him that could hurt" them.  (*Id.*)  Malki testified that Jackson was

4

"[v]ery—stuttering, eyes all over the place, a little nervous, you know. . . .  I can't really put it into words.  He was just very, very shaky and very, very nervous."  (*Id.*)

As the officers were speaking to Jackson, he was "backing up a little bit."  (*Id.* at 89.) This "rais[ed Malki's] suspicion level."  (*Id.*)  He "felt like, you know, [Jackson] could have—he was trying to figure out an escape route . . . ."  (*Id.*)  When the officers asked him if he had anything that could hurt them, Jackson "proceed[ed] to lift up his shirt" so that Malki "could see his skin at that point."  (*Id.* at 89–90.)  Jackson, still "[v]ery nervous," said "I don't have nothing on me, Officer.  I ain't got nothing.'"  (*Id.* at 90.)  When he lifted his shirt, Jackson kept "his elbows really tight to his body like he was pressing something against himself."  (*Id.*)  This further increased Malki's suspicion level.  (*Id.*)  The officers then told Jackson that "everything's going to be okay," but directed that he "place [his] hands on the windowsill of the van."  (*Id.*) Jackson complied.

The officers then conducted a "light pat, frisk of the outer garments for [their] safety . . . ."  (*Id.* at 90–91.)  Malki frisked the right side of Jackson's body; Contreras, the left.  (*Id.* at 91.)  Malki felt a hard, L-shaped object, so he yelled "gun" and "placed the defendant on the floor to effect an arrest."  (*Id.*)

### C.    Ramunno

Ramunno has been with the NYPD since 2003.  (*Id.* at 111.)  He is currently a training officer in the 44th precinct, where he "act[s] as a mentor to [the precinct's] newest officers." (*Id.*)  He was working as a training officer for Operation Impact in February of 2015.  (*Id.*)

Ramunno often patrols the park after 10:00 PM.  (*Id.* at 112.)  When he and his team see someone in the park, "[s]ometimes we might stop them, sometimes we might just talk to them first, explain to them that the park is closed.  It varies . . . [considering the t]ime of night, the weather, if there's a train nearby."  (*Id.*)  He would decide not to stop someone if "there were

children, baby carriages, people with bags of groceries, and stuff like that." (*Id.* at 113.)  But he would stop someone if he "saw a violation" taking place in his "presence or if there was a particular activit[y] going on in the park after it was closing." (*Id.*)  Specifically, Ramunno would stop someone if he were "[v]iolating the sign" at the entrance to the park. (*Id.*)  Joyce Kilmer Park is a "high crime area" (*id.* at 115) where Ramunno has "arrested people for firearms . . . [and] narcotics" (*id.* at 114).

On February 8, 2015, Ramunno was patrolling Joyce Kilmer Park in a police van with Contreras and Malki. (*Id.* at 115.)  Ramunno was driving. (*Id.*)  Ramunno saw Jackson enter the park. (*Id.* at 118.)  When Jackson saw the van, he did not initially react. (*Id.*)  As he approached the van, Ramunno "motioned to him—that we wanted to speak with him." (*Id.*)  When Ramunno asked to speak with him, Jackson "started to walk over to the van and then he started looking around." (*Id.*)  Jackson did not walk in the other direction. (*Id.*)  Jackson "seemed a little erratic . . . ." (*Id.* at 119.)  Malki and Contreras exited the van and "went to approach [Jackson] to conduct an interview to find out why he was in the park and to instruct him that he had walked past the posted sign." (*Id.*)  Sometime before Contreras and Malki exited the van, Ramunno "asked [Jackson] to stop." (*Id.* at 120.)  "Initially, [Jackson] stopped." (*Id.*)  While Malki and Contreras were talking to Jackson, Ramunno was two or three feet away from them, "trying to get the computer [in the van] . . . up and running . . . ." (*Id.*)

Although he did not see the whole encounter between the other officers and Jackson (*id.* at 121), Ramunno noticed when Jackson "grabbed his jacket, and pulled it up around his chest area, and started saying 'I don't have anything on me, Officers.  I don't have anything on me.'" (*Id.*)  Ramunno thought he was "more erratic and nervous at that time . . . [b]ecause he was pulling his jacket up around his neck area to show us his waistband." (*Id.*)  Ramunno then

described Jackson's elbows as "on the jacket up around here, his chest area."[4]  (*Id.*)  Malki and

Contreras approached Jackson.  (*Id.*)  The next thing Ramunno heard was "[g]un, gun."  (*Id.*)

## II.     Findings of Fact

The Court heard and reviewed the testimony of the three officers and observed their

demeanor and actions at the hearing.  The officers' accounts of the incident differ in certain

respects, and the Court finds the following facts by a preponderance of the evidence.  *See United*

*States v. Wyche*, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004) ("On a motion to suppress evidence

in a criminal trial, once [defendant] establishes a basis for his motion, the burden rests upon the

Government to prove, by a preponderance of the evidence, the legality of the actions of its

officers.") (citations omitted); *see also United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974)

("[T]he controlling burden of proof at suppression hearings should impose no greater burden

than proof by a preponderance of the evidence.")

(1) *Jackson entered the park at 164th Street and the Grand Concourse and began*

*walking toward the officers' van*.  All three officers' accounts support this fact.  (*Id.* at 11, 86–87,

116.)

(2) *Ramunno motioned for Jackson to stop and drove the van in his direction*.  All three

officers report that the van was driving in Jackson's direction (*id.* at 17–18, 86–87, 118), and,

although Ramunno is the only officer who testified that he motioned to Jackson, neither of the

other officers contradicted this account (*see generally id.*) and it is consistent with Jackson's

approaching the van.

---

[4] At this point, Ramunno pantomimed lifting his jacket with his elbows wide, away from his
chest.  Ramunno's arms were parallel to the ground, his elbows at shoulder height, and his hands
in front of his sternum.

(3) *As Jackson approached the van, he stopped walking two or three feet away from the driver's-side door, at which point the van stopped and Malki and Contreras exited the van on the passenger's side.* The testimony is somewhat inconsistent as to where and when Jackson stopped walking. (*Compare id.* at 118–19, *and id.* at 120, *with id.* at 17, *and id.* at 87.) The Court credits Ramunno's account on this fact because Ramunno was in the driver's seat as Jackson approached the van from that side, while Malki and Contreras were preparing to exit, and then exiting, the van on the passenger's side. (*Id.* at 62.) Malki and Contreras could not see exactly where Jackson stopped; Ramunno could.

(4) *Malki and Contreras walked around the van[5] to meet Jackson who, although turned slightly away from the van, was not walking away.* Ramunno testified that Jackson stopped three feet from the van; Contreras's testified that Jackson was walking away from the van on the driver's side of the van. (*Compare id.* at 61, *with id.* at 120.) The Court credits Ramunno's testimony on this point because Ramunno was in the driver's seat of the van as Jackson approached while Malki and Contreras were exiting on the other side of the van. (*Id.* at 115.) The record is unclear as to whether Jackson faced the officers during the counter (*compare id.* at 19, *with id.* at 89), but the Court finds that Jackson did stop when the officers called to him and did not attempt to flee. Malki and Contreras had to walk at a "moderate" pace to catch up because they had to hustle around the van to reach Jackson, who was two or three feet from the driver's side door of the van. (*Compare id.* at 61, *with id.* at 120.)

(6) *Contreras caught Jackson's attention by gently touching his shoulder. Contreras then asked him if he knew that the park was closed.* Contreras testified to two versions of how he got Jackson's attention—in the first version, he touched Jackson's shoulder lightly; in the second

---

[5] The testimony is inconsistent as to whether Malki walked around the front or the rear of the van. The Court need not, and does not, make a finding on this specific point.

version, he touched Jackson's hand.  (*Compare id.* at 20, *with id.* at 65.)  The Court credits the first version because Contreras seemed more confident in his testimony in the first instance, and more hesitant in the second.  Regardless, this is a minor inconsistency.

(7) *Jackson responded that he was just cutting through*.  Although Contreras is the only officer who testified to hearing these exact words, Contreras's account is not inconsistent with Malki's.  Malki testified that Jackson was not giving the officers a "complete full answer" to the question.  (*Id.* at 88.)  Ramunno did not, it seems, hear this exchange.

(8) *One of the officers then asked if Jackson had any identification and if he had any weapons*.  Malki is the only officer who testified to asking if Jackson had any identification, but no other officer contradicted this account, and it seems consistent with ordinary police practice.  Malki and Contreras both testified to asking about weapons or "things that can hurt."  (*Compare id.* at 19–20, *with id.* at 88.)

(9) *When asked these questions, Jackson raised his shirt, underneath his unbuttoned jacket, and said "I don't have anything on me, Officers," or something similar*.  Contreras is the only officer who testified that the jacket was open, but, again, no other officer contradicted this account.  (*Id.* at 66.)  All agreed that he raised his shirt or jacket to expose his waist.  The testimony is inconsistent as to whether Jackson said anything in response to the questioning.  Contreras testified that Jackson's response was "nonverbal" and that he did not say anything.  (*Id.* at 20.)  Both Malki and Ramunno, however, testified that Jackson said "I don't have nothing on me, Officer.  I ain't got nothing," (*id.*, at 90.) or "I don't have anything on me, Officers.  I don't have anything on me" (*id.* at 121).  Because two officers independently recall Jackson saying almost exactly the same thing, the Court credits their accounts, and finds that Jackson said "I don't have anything on me, Officers.  I don't have anything on me," or something similar to that.

(10) *Jackson's elbows were relatively close to his body, but were not locked to his sides.*
The testimony on Jackson's elbows is inconsistent.  Contreras testified that Jackson's "arms were
locked in." (*Id.* at 20.)  Malki testified that Jackson kept "his elbows really tight to his body like
he was pressing something against himself." (*Id.* at 90.)  But Ramunno testified that Jackson's
elbows were out away from his body. (*Id.* at 121.)  The Court finds that Jackson's elbows were
relatively close to his body, but not locked in.  The Court makes this finding because it observed
first-hand the way all three officers acted out Jackson's behavior.  Contreras and Malki, although
verbally testifying to locked-in elbows, demonstrated an action that was much less stark.
Contreras's forearms were roughly twenty to thirty degrees away from perpendicular to his body;
Malki's were only slightly closer.  And Ramunno, although he was seated in the van, clearly
testified that he saw Jackson raise his elbows; Ramunno did not report anything unusual about
the positioning of Jackson's elbows. (*Id.* at 121.)

(11) *Contreras saw Jackson's jacket bunch up slightly, creating the appearance that
there was a bulge in the jacket.  The bulge was neither unusually large nor suspiciously shaped.*
Contreras is the only officer who mentioned a bulge in Jackson's jacket.  The Court credits his
testimony that there was a "slight" bulge. (*Id.* at 22.)  The Court, though, does not find that this
bulge was unusual or suspicious in any way.  The Court does not make such a finding for three
reasons.  First, Contreras mentioned the "bulge" only in response to a specific question (*id.* at
22), and he left out the bulge when he was given an opportunity to describe all of the things
about Jackson's behavior that raised suspicion of a weapon, even though he had previously
answered a leading question in the affirmative. (*See id.* at 79–80.)  Second, Contreras's tone of
voice at the hearing indicated that he did not consider the bulge especially serious.  He
mentioned it very quickly, only in passing, and did not seem to emphasize it at all, in contrast to
other parts of his testimony.  Finally, Contreras described the bulge as "slight." (*id.*)  Although

10

he noted that "the jacket seemed weighted down somewhat, it wasn't kind of fluid" (*id.*), given

the Court's observation of Contreras's movements pantomiming Jackson's movements, an

unzipped jacket that is moved as Contreras described would not be expected to move fluidly in

these circumstances.  Contreras did not testify that the bulge was unusual, suspicious, or large.

(*See generally id.*)

(12) *Contreras and Malki then approached Jackson and conducted a pat-down of his*

*outer clothing.  Upon feeling a hard, L-shaped object, Malki yelled "gun!" and arrested*

*Jackson.*  All three officers are consistent on this point.

(13) *Throughout the encounter, Jackson appeared nervous, and his eyes were shifting*

*back and forth*.  All three officers testified that Jackson appeared "nervous," or "erratic."  (*Id.* at

19 (Contreras testifying that Jackson "seemed somewhat erratic, a little vibe of nervousness.");

*id.* at 88 (Malki: "He was just very, very shaky and very, very nervous."); *id.* at 119 (Ramunno:

"[Jackson] seemed a little erratic . . . .").)  But none of the officers testified to any specific

behaviors that indicated unusual nervousness.  All, instead, testified vaguely to Jackson's

nervous demeanor and erratic behavior.  Other than the specific description of Jackson's shifting

gaze, to which all three officers testified, and which the Court credits, the only physical

description of Jackson's nervousness is Malki's testimony that Jackson was "shaky" (*id.* at 88),

and Contreras's testimony that Jackson was not facing the officers (*id.* at 18).  The Court finds

that Jackson appeared somewhat nervous, but not remarkably so, and that his eyes were shifting

back and forth.

(14) *Joyce Kilmer Park is a moderately high-crime neighborhood*.  Ramunno, who is the

most experienced officer in this case, testified that Joyce Kilmer park is a "high crime area" (*id.*

at 115), where Ramunno has "arrested people for firearms . . . [and] narcotics" (*id.* at 114).

Contreras testified that Joyce Kilmer Park "can be a high-crime area," where "[n]arcotics takes

place" and "[p]eople [have been] robbed." (*Id.* at 7.)  Malki did not specifically discuss the

general level of crime in Joyce Kilmer Park, but he did respond affirmatively when asked

whether "Operation Impact involves sending newer officers into high-crime neighborhoods."

(*Id.* at 94.)  The Court, in deference to the officers' experience with these issues, finds that Joyce

Kilmer Park is a high-crime area, although not an extremely high-crime area.

## III.    Discussion

Jackson challenges both the stop and the frisk, moving to suppress the handguns

recovered as well as the statements that he made at the scene of his arrest and at the stationhouse.

Because the Court concludes that the officers lacked reasonable suspicion that Jackson was

armed and dangerous, the Court need not, and does not, address whether they had reasonable

suspicion sufficient to justify a stop.  And because the Court concludes that the challenged

statements are fruits of the unlawful frisk, the Court need not, and does not, address whether

Jackson's Fifth Amendment rights were violated.

### A.    The Firearms

To frisk a suspect who has been lawfully stopped, police officers must have reasonable

suspicion that the suspect is armed and dangerous. *Terry v. Ohio*, 392 U.S. 1, 24 (1968); *United

States v. Oates*, 560 F.2d 45, 61 (2d Cir. 1977).  Where officers have reasonable suspicion that

the suspect has committed, or is about to commit, a violent or dangerous crime, the suspicion

necessary to justify a stop ordinarily justifies a frisk as well. *See* WAYNE R. LAFAVE, 4 SEARCH

& SEIZURE § 9.6(a) nn. 55–61 (5th ed. 2014) (collecting cases).  But where, as here, the suspect

is stopped for a non-dangerous offense, the officers need independent, reasonable suspicion to

believe that he is armed and presently dangerous. *Id.* at nn. 63–76 (collecting cases).

Reasonable suspicion is less than a "fair probability" of wrongdoing, and "considerably

less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*,

490 U.S. 1, 7 (1989); *United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008).  Although the standard is "not high," *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir.) (quoting *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997)), *cert. denied*, 135 S. Ct. 705 (2014), officers "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry*, 392 U.S. at 21.  And although the officer may "draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person," *United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir. 2006) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)) (alterations in original), he "may not rely on an 'inchoate and unparticularized suspicion or "hunch."'" *Padilla*, 548 F.3d at 187 (quoting *Terry*, 392 U.S. at 27).  Courts are to evaluate the totality of the circumstances taken together to determine whether an officer had reasonable suspicion.  *Arvizu*, 534 U.S. at 274.  The standard is "objective," *Bailey*, 743 F.3d at 346, and the mere fact that the officer may have considered other, impermissible, reasons for a frisk is alone insufficient to invalidate it, *see, e.g.*, *United States v. Tinnie*, 629 F.3d 749, 752 (7th Cir. 2011).

To summarize, the Court finds the following potentially suspicious facts by a preponderance of the evidence:

- Jackson was nervous, but not exceptionally nervous, when he encountered the police.

- The encounter took place at night in a moderately high-crime area.

- Jackson's body was not directly facing the officers during the entirety of the encounter, and his eyes were darting back and forth.

- Jackson raised his shirt in response to being asked whether he had any weapons.

- Jackson's elbows were close to his body, and his jacket bunched up to create the appearance of a lump or bulge, but not an unusually large one.

Reasonable suspicion is so fact-intensive that on-point precedent to control the outcome of a case will typically be nearly impossible to find. *Cf. Illinois v. Gates*, 462 U.S. 213, 238 n.11 (1983) ("There are so many variables in the probable cause equation that one determination will seldom be a useful 'precedent' for another."). Rather, the Court must evaluate *all* of the circumstances in light of the governing legal test and decide whether the circumstances present in the case are sufficient to give rise to reasonable suspicion. The Court, having heard testimony and made findings of fact, and having personally observed the physical actions that the officers used to describe Jackson's behavior, concludes that the facts are insufficient to rise to the level of reasonable suspicion that Jackson was armed and dangerous. Comparing this case to cases from the Second Circuit and elsewhere suggests that the officers here fell short of the requisite suspicion that courts ordinarily require.

In *United States v. Padilla*, 548 F.3d 179, 189 (2d Cir. 2008), the Second Circuit held that "the high-crime neighborhood, the sight of two men surreptitiously following a man whose appearance suggested drug use down an otherwise-deserted street, the choice of a dark path not commonly used at night, [and] the apparent adjustment of a concealed firearm . . . provided ample basis for an investigative stop," for suspected armed robbery, and an accompanying frisk. *Id.* Here, in contrast, the Court is unable to find facts sufficient to give rise to a reasonable suspicion that Jackson was concealing a firearm; and the violation for which Jackson was stopped—being in the park after closing—does not indicate dangerousness. And unlike the "apparent adjustment of a concealed firearm," *id.*, raising one's shirt is not a suspicious response to being asked by police officers if one has a weapon. *See United States v. Baker*, 78 F.3d 135,

14

136 (4th Cir. 1996) ("In order to determine whether Baker was carrying a concealed weapon,

Officer Pope *ordered* Baker to lift his shirt above the bulge [at his waist]." (emphasis added)).

        Similarly, in *United States v. Simmons*, 560 F.3d 98, 108 (2d Cir. 2009), the Second

Circuit held that where "officers, after initiating the stop, twice ordered that [the defendant]

remove his hands from his pockets, which he refused to do[,] . . . [coupled with t]he report of an

assault in progress, the matching description [of the defendant and the assault suspect], and the

additional factors that supported the stop[,] provided the officers with reason to believe that [the

defendant] was armed and dangerous, and that the refusal to remove his hands was an effort to

conceal a weapon." *Id.*  In contrast, the Court here is unable to find that Jackson did anything

consistent with trying to access or conceal a firearm.  Jackson did not refuse to follow police

instructions, nor was there suspicion of a violent crime in progress.  Quite the opposite.  And he

did not move his hands toward an area where a firearm might be concealed; indeed, his hands

were visible, outside his clothing, throughout the encounter.  *See also United States v. Paulino*,

850 F.2d 93, 98 (2d Cir. 1988) (holding that "furtive movement provided a legal basis for the

protective search").  Similarly, although Contreras testified to seeing a "bulge" in Jackson's

jacket, and the Court has found that Contreras did, in fact, see some sort of bulge in the jacket,

there is no testimony to support the proposition that the bulge was not a perfectly ordinary thing

to see in a jacket worn by a person whose arms were raised in the manner described here.  *Cf.*

*United States v. Hamilton*, 978 F.2d 783, 785 (2d Cir. 1992) (per curiam) (finding reasonable

suspicion for a frisk where a defendant was observed with an "*unusual* bulge") (emphasis

added); *Abdurrahman v. Henderson*, 897 F.2d 71, 74 (2d Cir. 1990) (holding that a pat-down

based on a "bulge" was constitutional only because another tip established that defendant carried

a gun and because he "move[d] his hands frantically through his pockets"); *Oates*, 560 F.2d at 60

(2d Cir. 1977) ("[A] *prominent* bulge around the area of Daniels' right coat pocket . . . .")

(emphasis added).  Significantly, no officer testified here that there was any reason to believe that the "bulge" in Jackson's jacket was a suspicious one.

In *Holeman v. City of New London*, 425 F.3d 184, 192 (2d Cir. 2005), the Second Circuit validated a frisk where, "[i]n the middle of the night, the police were in a high crime area with a convicted narcotics felon who was acting suspiciously.  These facts alone suffice to support reasonableness." *Id.*  Here, in contrast, Jackson was stopped shortly after 10:00 PM, in a moderately high-crime area, and, again, he was not stopped for any reason other than being in the park after closing.  Similarly, although Jackson was nervous, and although he was not directly facing the officers during the entirety of the encounter, there are no other objective facts to indicate that he was acting "suspiciously." *Id.*

The facts here fall below those in which the Second Circuit has found reasonable suspicion for a frisk.  Cases from other circuits and the state courts also support the conclusion that reasonable suspicion to support the frisk was lacking here.  The facts in this case are similar to, but even less objectively suspicious than, those in *Robinson v. United States*, 76 A.3d 329, 331 (D.C. 2013).  There, "Mr. Robinson, who had just discarded a half-drunk bottle of vodka and appeared to be intoxicated, did not respond to the 'do you have a gun?' inquiry.  Instead, the police observed him make 'back and forth,' 'side to side' hand motions on his chest (he was wearing a winter coat, but he did not try to reach in any pockets or inside the coat)." *Id.*  The Court of Appeals for the District of Columbia found that these circumstances were insufficient to create reasonable suspicion.  Here, Jackson was observed making motions with his hands and arms that the Court has found, as a factual matter, not to be suspicious.  He did, in fact, verbally respond to the officers' inquiry about weapons.  He did not appear intoxicated.  And, although he appeared "nervous," nervousness is of limited significance in determining reasonable suspicion, and Jackson's nervousness was not unusually severe.  *See United States v. Broomfield*, 417 F.3d

16

654, 655 (7th Cir. 2005) (Posner, J.); *United States v. Jones*, 269 F.3d 919, 929 (8th Cir. 2001)

("[W]e are wary of the objective suspicion supplied by generic claims that a Defendant was

nervous or exhibited nervous behavior after being confronted by law enforcement officials."

(citation and internal quotation marks omitted)); *United States v. Fernandez*, 18 F.3d 874, 879

(10th Cir. 1994) ("[N]ervousness is of limited significance in determining reasonable

suspicion."); *see also United States v. Simpson*, 609 F.3d 1140, 1147 (10th Cir. 2010); *United

States v. Urrieta*, 520 F.3d 569, 577 (6th Cir. 2008) ("[T]his court has found nervousness

inherently unsuspicious, and has therefore given it very limited or no weight in the reasonable-

suspicion calculation."); *United States v. McKoy*, 428 F.3d 38, 40 (1st Cir. 2005) ("Nervousness

is a common and entirely natural reaction to police presence . . . ."); *United States v. Richardson*,

385 F.3d 625, 630–31 (6th Cir. 2004); *United States v. Portillo-Aguirre*, 311 F.3d 647, 656 n.49

(5th Cir. 2002); *United States v. Jones*, 269 F.3d 919, 928 (8th Cir. 2001).

      A finding of reasonable suspicion cannot be supported primarily from the fact that

Jackson was turned away from the officers.  Cases where a suspect's walking away from

officers, or failing to turn to face them, is sufficiently indicative of dangerousness generally

involve (1) the suspect's actually walking away from the officers for an appreciable distance and

(2) the presence of other significantly suspicious circumstances.  *See United States v. Hunter*,

291 F.3d 1302, 1306 (11th Cir. 2002); *compare United States v. Williams*, 731 F.3d 678, 686–87

(7th Cir. 2013) (suppressing evidence even though "Mr. Williams . . . had his hands in his pocket

or near his waistband, avoided eye contact, and began to move away from the area"), *with United

States v. Patton*, 705 F.3d 734, 736 (7th Cir. 2013) (admitting evidence where "Patton took at

least five steps away from the [the police]; by [the officer's] estimate, [Patton] backed away

between five and fifteen feet from the sidewalk where he had been standing and onto the lawn

behind him."). Here, Jackson stopped when he was told to stop. Instead of walking away from the officers, he turned his body slightly away from them.

Finally, the "bulge" fails to provide reasonable suspicion for the frisk. Cases where a "bulge" in a suspect's clothing justifies a frisk require that the bulge's size, shape, and placement justify the conclusion—that is, the reasonable suspicion—that the bulge is a *weapon*. *See United States v. Chaney*, 584 F.3d 20, 26–27 (1st Cir. 2009) (discussing "the size and rigid nature of the object") (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977)); *United States v. Black*, 525 F.3d 359, 361–62 (4th Cir. 2008) (discussing "the shape of the object in Black's pocket, which appeared to be the slide of a semi-automatic handgun"); *Keah v. State*, 508 S.W.2d 836, 839 (Tex. Crim. App. 1974) (suppressing evidence where "[w]hen asked what he believed the bulge to be, [the officer] stated, 'I did not know whether it would be a weapon or what it would be'"). Here, the scant testimony on the "bulge" does not support the conclusion that the officers had any reason to believe that the bulge was suspicious—indeed, it appears only as an afterthought in the testimony of one officer. The Court's factual finding that the bulge was not unusual or suspicious, therefore, forecloses the conclusion that it gave the officers reasonable suspicion that Jackson was armed and dangerous.

On the specific facts of this case, the totality of the circumstances present was insufficient to give rise to a reasonable suspicion that Jackson was armed and dangerous. The cases cited above are helpful examples, but none is dispositive because the Court can determine whether reasonable suspicion existed only by considering the unique facts of *this* case. Because none of the cases above have facts identical to these, those cases can serve only as guideposts. *Cf. Gates*, 462 U.S. at 238 n.11. The officers lacked reasonable suspicion to conduct the frisk here and, accordingly, the firearms found on Jackson's person are suppressed.

**B.      The Statements**

Jackson argues that his statements were the illegal fruits of his unlawful stop and frisk and, therefore, must be suppressed as well.  *See, e.g.*, *Taylor v. Alabama*, 457 U.S. 687, 690–91 (1982).  The Government does not contest this point.  (*See* Dkt. No. 16, Government's Memorandum of Law, at 10–12.)  Accordingly, Jackson's motion to suppress his statements is granted.

**IV.      Conclusion**

For the foregoing reasons, Jackson's motion to suppress physical evidence and statements (Docket No. 12) is hereby GRANTED.


SO ORDERED.


Dated:  July 29, 2015
        New York, New York

                                    _____
                                    J. PAUL OETKEN
                                    United States District Judge